IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOSEPH VALENTINO | § | |
| | § | |
| v. | § | No. _____ |
| | § | |
| UNITED STATES MARSHAL FOR | § | |
| THE SOUTHERN DISTRICT | § | |
| OF TEXAS. | § | |

**PETITION OF JOSEPH VALENTINO FOR A WRIT OF HABEAS CORPUS**

JOSEPH VALENTINO, through his attorneys Chris Flood and John Cline, petitions the Court for a writ of habeas corpus under 28 U.S.C. § 2241.  Valentino seeks the writ to challenge his extradition to the Netherlands, which was certified on January 23, 2020 by United States Magistrate Judge Peter Bray.  Habeas corpus is available in the extradition context "to inquire whether the magistrate had jurisdiction, whether the offense charged is within the treaty and by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Fernandez v. Phillips*, 268 U.S. 311, 313 (1925); *see, e.g., Garcia-Guillern v. United States*, 450 F.2d 1189, 1191 (5th Cir. 1971); *Jimenez v. Aristeguieta*, 311 F.2d 547, 555 (5th Cir. 1962).  For the following reasons, the Court should grant the writ and hold that extradition must be denied:

1.　　The charges against Valentino were barred by the statute of limitations under United States law, with the exception of two out of five tax returns charged in Count 2. Thus, extradition on Count 1 and most of Count 2 "shall not be granted" under Article 6 of

the United States-Netherlands extradition treaty ["the Treaty"].[1]  Because the Netherlands has not specified the punishment (if any) for the portions of Count 2 that are not time-barred, extradition must be denied.

2.      The two governments involved--the United States and the Netherlands--failed to file the extradition complaint in this Court for almost fourteen years after the trial court found Valentino guilty in absentia and more than ten and a half years after the Amsterdam Court of Appeals pronounced his final sentence of 34 months imprisonment. That inexcusable delay in executing the judgment violates Valentino's right to due process. Extradition must therefore be denied under Article 6 of the Treaty.

3.      The factual basis that the Netherlands submitted fails to establish probable cause to believe that Valentino knew that intangible assets on the various tax returns were overvalued and thus that too much depreciation was claimed.  Absent evidence of this knowledge, there is no probable cause to believe that Valentino committed the offenses for which the Netherlands seeks to punish him.

_____

[1] Extradition Treaty Between the United States of America and the Kingdom of the Netherlands, June 24, 1980, 25 U.S.T. 1334, as amended by the agreement comprising the instrument contemplated by Article 3(2) of the Agreement on Extradition Between the United States of America and the European Union signed at the Hague on 24 June 1980, Sept. 29, 2004, S. Treaty Doc. 109-14 (2006) (collectively "the Treaty").  The Treaty appears at pages 9-22 of Government Hearing Exhibit ("GHX") A and is attached to this petition as Exhibit A.  The Amsterdam Court of Appeals decision (GHX U) is attached as Exhibit B.  The Magistrate Judge's January 23, 2020 opinion certifying that Valentino is extraditable is attached as Exhibit C.  Except where otherwise indicated, all page numbers refer to the Bates number at the bottom center of the page, rather than the page numbering in the document itself.  Pleadings filed before the Magistrate Judge in No. 4:18-mj-00146 are cited as "Mag. Doc.," followed by the docket number.  We respectfully request that the entire record before the Magistrate Judge be made part of the record before this Court.

## PROCEDURAL HISTORY

The prosecution of Valentino in the Netherlands began with the issuance of a summons on November 19, 2002.  Ex. B at 860; Ex. C at 24.  He was charged in the district court of Amsterdam in three counts.  Count 1 charged him with participation in a criminal organization in violation of Article 140 of the Netherlands Penal Code.  The alleged organization consisted of Valentino, six individuals, and two companies.  According to the Court of Appeals, the organization was:

> for the purpose of committing crimes, namely:
>
> --      forgery of documents and
>
> --      filing incorrect corporate income tax returns and
>
> --      bribing persons other than civil servants,
>
> which participation consisted of carrying out acts and attending discussions about the purchase and/or sale of cash companies and/or carrying out (preparatory) acts relating to the purchase and/or sale of intangible assets and/or transferring and/or receiving cash from the aforementioned cash companies to and in (foreign) bank accounts and/or making and/or maintaining contacts.

Ex. B at 884.

Count 2 charged Valentino with aiding the filing of false corporate tax returns in the Netherlands in violation of Article 68 of the Netherlands State Taxes Act.  Count 3 charged forgery of documents in violation of Article 225 of the Netherlands Penal Code.

Valentino did not appear at trial in person, and no attorney appeared for him.  He was tried in absentia.  On February 24, 2004, the district court found Valentino guilty on all counts and sentenced him to 42 months in prison.  GHX B at 32.

On March 3, 2004, Valentino appealed through counsel to the Amsterdam Court of Appeals. GHX B at 10. That court rendered its opinion on July 13, 2007. Ex. B at 858. It found Valentino guilty on Count 1 (participation in a criminal organization) and on Count 2 with respect to five corporate tax returns. The Court of Appeals acquitted Valentino on Count 3. Ex. B at 884-87, 967, 1051, 1182-83. Of the five returns on which the Court of Appeals found Valentino guilty, none was filed within five years of November 19, 2002, the date the prosecution was initiated, and only two were filed within six years of that date. Ex. B at 884-87 (describing tax returns at issue).[2] The Court of Appeals imposed a sentence of 34 months. It did not allocate that sentence between the counts of conviction. Ex. B at 1188.

Valentino's attorney filed a timely notice of appeal to the Netherlands Supreme Court, but no attorney appeared for Valentino before that court and no brief was ever filed on his behalf. GHX P at 224. Nonetheless, it took almost nineteen months--until February 3, 2009--for the Supreme Court to declare Valentino's appeal "inadmissible," GHX P at 224, and another five months, until July 7, 2009, to enter judgment against him, GHX P at 223.

---

[2] The five returns at issue are as follows:  (1) the 1993 corporate return for American Energy B.V. (formerly Anterra Beheer BV), filed September 15, 1995; (2) the 1994 corporate return for American Energy B.V. (formerly Anterra Beheer BV), filed September 15, 1995; (3) the 1994 corporate tax return for American Energy Resources N.V. (formerly Rentafixe N.V.), filed September 15, 1995; (4) the 1995 corporate return for American Energy B.V. (formerly Anterra Beheer BV), filed August 1, 1997; and (5) the 1995 corporate return for American Energy Mining B.V. (formerly Egg BV), filed August 1, 1997. Ex. B at 884-87.

The Netherlands gradually began the process of seeking Valentino's extradition to serve his sentence.  On October 12, 2009, Valentino was placed on the Netherlands' "national list of wanted persons" because, supposedly, "his temporary or permanent residence was unknown," GHX B at 62--even though Valentino's home and office addresses were part of the record and his home address was even included in the Court of Appeals' opinion, Ex. B at 858.  Valentino's case was delivered to the "Fugitive Active Search Team," or "FAST," and in November 2009 FAST (then known as the "Criminal Sentences Execution Team") requested Valentino's file from the Procurator General's office at the Court of Appeals.  GHX B at 63.  Nine months later, in August 2010, FAST received the file.  GHX B at 63.

More than two years passed without any evident effort by the Netherlands to extradite Valentino.  On November 8, 2012, the Netherlands claims to have prepared a request for Valentino's provisional arrest in preparation for extradition.  GHX B at 30, 63. The Ministry of Foreign Affairs allegedly transmitted this request to the embassy in Washington, D.C. four months later, on March 19, 2013--but it was never received.  GHX B at 63.  The Netherlands apparently transmitted a request for provisional arrest and extradition on or near August 27, 2013, GHX B at 50, 58, 63, together with an explanation of "the passage of time before the request for extradition was submitted in the Valentino case," GHX B at 62.  (For some reason, the Department of Justice Office of International Affairs puts the date of this extradition request at September 30, 2013.  GHX T at 2.)  By this point, more than six years had passed since the Amsterdam Court of Appeals had pronounced Valentino's sentence.

Another year and a half elapsed without any apparent effort by either government to advance Valentino's extradition.  Then, on May 7, 2015, the United States sent the Netherlands a diplomatic note identifying various deficiencies in the extradition package.  GHX T at 2.  The Netherlands provided some supplemental information on June 9, 2015 (GHX T at 2) and in December 2015 (GHX R-2, GHX D at 2).  On July 6, 2016--now almost nine years after the Court of Appeals sentenced Valentino--the Netherlands resubmitted the entire extradition package.  GHX T at 2; GHX R-4; GHX R-7.

The United States still did not find the extradition request sufficient.  On June 27, 2017, almost a year after the July 2016 extradition request, the Netherlands provided information about Valentino's identity; noted that "[t]he discussion about his identity has been languishing for quite some time now"; and requested that the United States either accept the information furnished as sufficient or provide "a formal letter of rejection for our extradition."  GHX R at 1.

Seven more months passed.  Finally, on February 2, 2018--more than *ten and a half years* after the Court of Appeals pronounced Valentino's sentence--the United States, on behalf of the Netherlands, filed the extradition complaint in this Court.  Valentino was arrested.  On May 11, 2018, Magistrate Judge Stephen Smith ordered him released pending the extradition hearing.  Mag. Doc. 29.  On December 4, 2019, Magistrate Judge Peter Bray held an extradition hearing.  On January 23, 2020, Magistrate Judge Bray denied Valentino's motion to dismiss the complaint and certified him for extradition.  Ex. C (Mag. Doc. 72).  We discuss Magistrate Judge Bray's opinion in more detail below.

## FACTUAL BACKGROUND[3]

At the time of the events in question, Valentino was a tax partner at the Houston law firm Chamberlain, Hrdlicka, White, Williams & Martin.  In 1993, Valentino met Fay Russell by chance at breakfast in Houston.  Ex. B at 1040.  Russell, who had been a client of the Chamberlain, Hrdlicka firm for many years, sought Valentino's tax advice in connection with a company called Oxbridge Investments Ltd.  Ex. B at 893, 1040.  Russell and two colleagues had incorporated Oxbridge a year or two before he met Valentino.  Ex. B at 1034.  Valentino represented Russell, Oxbridge, and certain Oxbridge subsidiaries until sometime in 1997.

Beginning in 1992, Oxbridge purchased for-profit companies--sometimes called "cash companies"--from a subsidiary of ABN/AMRO Bank in Amsterdam.  Ex. B at 891-94, 903-07, 1035-38.  At the time of the transactions, ABN/AMRO was one of the largest and most respected banks in the Netherlands.  The for-profit companies were wholly owned subsidiaries of ABN/AMRO.  They lacked any business purpose and had no activities or employees.  In a typical arrangement, ABN/AMRO borrowed from the for-profit company, creating interest income for the company and an interest deduction for ABN/AMRO.  The Netherlands Tax and Customs Administration approved these transactions and ABN/AMRO's treatment of them for tax purposes.  Ex. B at 903-07, 1038, 1125-26, 1136-37.

---

[3] We draw these alleged facts from the Court of Appeals' opinion.  We do not concede their accuracy.

According to the Court of Appeals' opinion, Valentino and Dutch tax counsel M. van Dieren (who worked in Amsterdam at Arthur Andersen, at the time a major international accounting firm) developed a tax plan that involved the for-profit companies (now subsidiaries of Oxbridge) acquiring certain assets from Oxbridge (including rights to oil leases, Kentucky coal, Mexican coal, zeolite, and Colorado gold and silver mining claims), depreciating those assets, and using the depreciation to reduce the companies' tax liability for the current year or for previous years.[4]  Ex. B at 891-92, 895-98, 1040-41. Several corporate returns were filed using this approach, including the five returns on which the Court of Appeals found Valentino guilty.  Valentino did not prepare, sign, or file the returns in question.  Ex. B at 894-97.  Van Dieren from Arthur Andersen prepared them with the Dutch accounting firm Perfect Partners, Ex. B at 963, 1043, and Russell signed them, Ex. B at 914-17, 1043, 1166, 1176.  Valentino conveyed certain information to Arthur Andersen and Perfect Partners, on which they allegedly relied in preparing the returns.  Ex. B at 964-67, 1043.

Oxbridge's purchase of for-profit companies from ABN/AMRO Bank ended in mid-1997 when the Netherlands tax authority, which had previously approved ABN/AMRO's sale of companies to Oxbridge, informed the bank that it would no longer do so.  Ex. B at 910 (after the notice from the tax authorities in late June 1997, "Oxbridge did not purchase any more for-profit companies in the Netherlands, and no more assets were contributed to

---

[4] This is a simplified version of the tax plan, focused on the features that are relevant here.

any Dutch company in the Oxbridge group"); *see* Ex. B at 1157-60.  The final two corporate tax returns at issue were filed August 1, 1997.  Ex. B at 910.

The Amsterdam Court of Appeals conceded that the tax plan on which Valentino worked was lawful.  Ex. B at 898, 970, 980, 1021, 1030, 1138-39.  The corporate tax returns were false, according to the Court of Appeals, because they overvalued the assets that the for-profit companies acquired.  Because the assets were overvalued, the depreciation of those assets was excessive and, as a result, the companies' income was understated.  Ex. B at 928, 935, 946, 951, 956, 958-62, 1182-83.  Valentino's liability for the allegedly false tax returns turns largely on whether he knew that the assets were overvalued and encouraged Arthur Andersen, Perfect Partners, and Russell--the preparers and signers of the returns, respectively--to rely on those overstated values.  We address the evidence on that issue in Part III below.

## ARGUMENT

### I.     COUNT 1 AND MORE THAN HALF OF COUNT 2 ARE BARRED BY THE STATUTE OF LIMITATIONS AND THUS EXTRADITION MUST BE DENIED UNDER ARTICLE 6 OF THE TREATY.

Article 6 of the Treaty--captioned "Lapse of Time"--provides that "[e]xtradition shall not be granted when the prosecution or the enforcement of the penalty for the offense for which extradition has been sought has become barred by lapse of time according to the law of the Requested State."  Ex. A at 11.  In other words, if an offense with which Valentino was charged in the Netherlands would have been barred by the statute of limitations if charged in the United States, then extradition may not be granted.  *See, e.g.,*

*Caplan v. Vokes*, 649 F.2d 1336, 1340-42 (9th Cir. 1981) (denying extradition on charges barred by the statute of limitations).

To determine if extradition must be denied under Article 6, a court engages in a three-step analysis. First, the court must determine which United States offense "is most closely analogous to the charged [foreign] offenses." *Sainez v. Venables*, 588 F.3d 713, 716 (9th Cir. 2009) (quotation omitted). Second, the court must ascertain the statute of limitations applicable to that United States offense under this country's law. Finally, the court must decide whether, based on the evidence submitted with the extradition request, the offense would have been barred by the statute of limitations if brought under United States law.

As we demonstrate below, the offense charged in Count 1 (participation in a criminal organization in violation of Article 140 of the Netherlands Penal Code) would have been barred by the applicable five-year statute of limitations if charged in the United States under the most analogous statute (participating in the conduct of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c)). And all but two of the false tax return charges in Count 2 would have been barred under the applicable six-year statute of limitations if charged in the United States under the most analogous statute (aiding or assisting in the filing of a false tax return in violation of 26 U.S.C. § 7206(2)).

A.    Count 1.

    1.    Most Analogous Offense.

Count 1 charges participation in a criminal organization in violation of Article 140 of the Netherlands Penal Code.  The elements of the offense, as recited by the Amsterdam Court of Appeals, are:  "(a) participation (b) in a structured and lasting organization (c) the purpose of which is to commit crimes."  Ex. B at 979; Ex. C at 14.  This offense bears a striking resemblance to a substantive RICO offense under 18 U.S.C. § 1962(c).  That offense requires proof (a) that the defendant was "employed by or associated with the enterprise charged"; (b) that the "enterprise existed as alleged in the indictment"; and (c) that the defendant, "either directly or indirectly, conducted or participated in the conduct of the affairs of the enterprise through a pattern of racketeering activity."  Fifth Circuit Pattern Jury Instructions, Instruction 2.79, at 388-89 (2015).

Just as the "organization" in Article 140 must be "structured and lasting," an "enterprise" under § 1962(c) "must be proven to have been an ongoing organization, formal or informal, that functioned as a continuing unit."  Instruction 2.79 at 388.  Just as "[i]t is not required [under Article 140] that the organization only has a criminal purpose, given that in committing crimes, the organization can also pursue a legal purpose," Ex. B at 980, the term "enterprise" under § 1962(c) "includes both legal and illegal associations," Instruction 2.79 at 388.  Just as an "organization" under Article 140 can include (as in this case) individuals and organizations that do not comprise a single legal entity (such as a corporation or a partnership), an "enterprise" under § 1962 includes both legal entities "and any union or group of individuals associated in fact, although not a legal entity," Instruction

2.79 at 388.  Just as the defendant must "belong to the organization" under Article 140, Ex. B at 979, the defendant must be "employed by or associated with the enterprise" under § 1962(c), Instruction 2.79 at 388.

This comparison leaves no doubt that the Article 140 and 18 U.S.C. § 1962(c) offenses are very similar.  To be clear, however, the offenses are not identical.  In particular, Article 140 requires that the defendant participate in the organization, but it does not require that he do so through the commission of crimes.  Ex. B at 979.  By contrast, § 1962(c) requires that the defendant participate in the affairs of the enterprise through a pattern of racketeering activity, meaning two or more crimes within a ten year period. Instruction 2.79 at 388-90.  Similarly, as the Magistrate Judge observes, tax offenses are not RICO predicate offenses, while they can serve as predicate offenses under Article 140. Ex. C at 29.  But offenses need not be *identical* to be *analogous*, and there is no closer analog to Article 140 under United States law than § 1962(c).

### 2.       The Applicable Statute of Limitations for § 1962(c).

A charge under 18 U.S.C. § 1962(c) is subject to the five-year statute of limitations in 18 U.S.C. § 3282.  *See, e.g., United States v. Bethea*, 672 F.2d 407, 419 (5th Cir. 1982). That five-year period runs from the defendant's last act of racketeering activity.  As the Fifth Circuit has explained, "in order to convict a defendant of violating § 1962(c) by participating in a pattern of racketeering activity, the jury must find that the defendant committed at least two acts of racketeering activity, one of which must have occurred within five years of the date of the indictment."  *Id.*; *see, e.g., United States v. Starrett*, 55 F.3d 1525, 1544-45 (11th Cir. 1995) (same); *United States v. Torres Lopez*, 851 F.2d 520,

525 (1st Cir. 1988) (same); *United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987) (same).

### 3.     Count 1 Was Charged Outside the Five-Year Statute of Limitations.

The summons to Valentino dated November 19, 2002 marks the start of the criminal case against him. *See, e.g., Martinez v. United States*, 828 F.3d 451, 456 (6th Cir.) (en banc), *cert. denied*, 137 S. Ct. 243 (2016). The statute of limitations stopped running that day at the earliest. Five years before that date is November 19, 1997. The question is whether the record contains any evidence that Valentino acted after November 19, 1997, to participate in the alleged criminal organization described in the Court of Appeals' opinion.

The answer is no. The last act the Court of Appeals' opinion alleges Valentino took personally was a letter from him to Dutch tax counsel van Dieren on June 30, 1997. Ex B at 965, 1027. The last criminal act the Court of Appeals opinion attributes to Valentino is the filing of false corporate tax returns on August 1, 1997, Ex. B at 886-87, although Valentino is not alleged to have signed or filed the returns in question. Even if the August 1, 1997, tax returns are attributed to Valentino, the statute of limitations is not satisfied. The Court of Appeals' opinion identifies no act that Valentino took to participate in the alleged criminal organization on or after November 19, 1997. Under Article 6 of the Treaty, therefore, "[e]xtradition shall not be granted" on Count 1.

### 4.    The Magistrate Judge's Opinion.

The Magistrate Judge concludes that the Article 140 charge in Count 1 is most analogous to the general federal conspiracy statute, 18 U.S.C. § 371, and thus is subject to the six-year statute of limitations for conspiracies to commit tax offenses.  Ex. C at 26-27.[5] That is clearly wrong.  The "essence" of conspiracy is the *agreement* to commit an unlawful act.  *United States v. Shabani*, 513 U.S. 10, 16 (1994); *see, e.g., United States v. Ogle*, 328 F.3d 182, 189 (5th Cir. 2003).  The agreement is the "essential element of the crime, and serves to distinguish conspiracy from aiding and abetting which, although often based on agreement, does not require proof of that fact."  *Iannelli v. United States*, 420 U.S. 770, 777 n.10 (1975).  Article 140, unlike § 371, does not require proof of an agreement.  Conversely, Article 140 requires proof that the defendant "participated" in the criminal organization.   Section 371 does not require participation or any other action by the defendant; it requires only that he *agree* to commit an unlawful act and that someone--not necessarily the defendant--perform an overt act in furtherance of the agreement.   In a nutshell, the actus reus of Article 140 (and § 1962(c)) is *participation*; the actus reus of § 371 is *agreement*.  The offenses are entirely different.

---

[5] The general federal conspiracy statute has a five-year statute of limitations in most instances, 18 U.S.C. § 3282, and a six-year statute of limitations "where the object of the conspiracy is to attempt in any matter to evade or defeat any tax or the payment thereof," 26 U.S.C. § 6531(8).  The statute runs from the last overt act committed by any conspirator, not just by the defendant.  *See, e.g., United States v. Loe*, 248 F.3d 449, 457 (5th Cir. 2001); *United States v. Manges*, 110 F.3d 1162, 1170 (5th Cir. 1997).  By contrast, as discussed above, 18 U.S.C. § 1962(c) has a five-year statute of limitations, which runs from the defendant's last act of racketeering activity.

This distinction is most evident in comparing the substantive RICO offense, 18 U.S.C. § 1962(c), with RICO conspiracy, 18 U.S.C. § 1962(d).  As noted, the actus reus of a § 1962(c) offense is the defendant's *participation* in the affairs of the enterprise through a pattern of racketeering activity.  By contrast, the essential element of RICO conspiracy is the *agreement* to commit the substantive RICO offense.  *See, e.g., Salinas v. United States*, 522 U.S. 52, 61-66 (1997); *United States v. Delgado*, 401 F.3d 290, 296-97 (5th Cir. 2005).  As *Salinas* and *Delgado* make clear, a defendant can be guilty of a § 1962(d) conspiracy without engaging in any act other than the agreement itself.  The two offenses are so clearly distinct that both can be charged against the same defendant based on the same underlying facts without violating the Double Jeopardy Clause.  *See, e.g., United States v. Marino*, 277 F.3d 11, 39 (1st Cir. 2002); *United States v. Sessa*, 125 F.3d 68, 71-73 (2d Cir. 1997).

The Netherlands Penal Code, like our federal criminal law, draws a clear line between conspiracies and substantive offenses.[6]  Article 80 of the Penal Code recognizes the concept of conspiracy and defines it much as the United States does.  But the Code does not have a general conspiracy statute applicable to all substantive offenses; in other words, it has no provision analogous to 18 U.S.C. § 371.  Instead, the Code has a handful of provisions that make it a crime to conspire to commit specific substantive offenses.  To cite several examples, Article 96(1) makes it a crime to conspire to commit the offenses in

---

[6]  For an unofficial translation of the Netherlands Penal Code, see http://www.ejtn.eu/PageFiles/6533/2014%20seminars/Omsenie/WetboekvanStrafrecht_ENG_PV.pdf.  The government did not contest these principles of Dutch law before Magistrate Judge Bray.

Articles 92 through 95a, relating to certain offenses against the security of the Dutch state. Article 103 makes it a crime to conspire to commit the offense in Article 102, relating to aiding enemies of the Dutch state. Article 114b makes it a crime to conspire with terrorist intent to commit the offenses in Article 108, relating to offenses against the Dutch royal family. Notably, however, there is no provision in the Netherlands Penal Code making it a crime to conspire to violate Article 140. In other words, there is no provision in the Netherlands Penal Code analogous to the RICO conspiracy provision, 18 U.S.C. § 1962(d), or to the general conspiracy provision, 18 U.S.C. § 371.

The Magistrate Judge dismisses the close parallel between the elements of an Article 140 offense and the elements of an offense under 18 U.S.C. § 1962(c) and instead looks solely to Valentino's alleged tax-related conduct. But this is the wrong approach. The Court should, of course, take account of Valentino's alleged conduct--but it must do so in the context of the charged offenses. Those offenses make certain conduct criminal, and it is *that* alleged conduct by Valentino that must be considered in determining the most analogous United States offense. *See, e.g., Clarey v. Gregg*, 138 F.3d 764, 767 (9th Cir. 1998) (referring to "conduct actually charged"); *United States v. Gonzalez*, 2014 U.S. Dist. LEXIS 49304, at *22 (C.D. Cal. Apr. 9, 2014) (primary focus should be on the nature of the "conduct charged").

The Amsterdam Court of Appeals spelled out Valentino's conduct underlying the Article 140 charge in Count 1. According to that court, Valentino "participated in an organization . . . which organization was for the purpose of committing crimes." Ex. B at 884. Valentino's "participation" in the criminal organization "consisted of carrying out acts

and attending discussions about the purchase and/or sale of cash companies and/or carrying out (preparatory) acts relating to the purchase and/or sale of intangible assets and/or transferring and/or receiving cash from the aforementioned cash companies to and in (foreign) bank accounts and/or making and/or maintaining contacts."  Ex. B at 884.  This description of Valentino's allegedly criminal conduct--his "participation"--does not mention taxes or tax returns.  Instead, the conduct for which he was found guilty on Count 1--"participating in" a criminal organization--largely mirrors the offense under 18 U.S.C. § 1962(c) of participating in the affairs of an enterprise through a pattern of racketeering activity.

The government--in an argument apparently accepted by the Magistrate Judge--sought to transform the Count 1 offense into a tax conspiracy by seizing on one word--"collaboration"--and one phrase--"filing incorrect corporate income tax returns."  Mag. Doc. 59 at 14-15 (citing Ex. B at 884).  That word and phrase, however, describe the nature of the "organization"--analogous to the "enterprise" under RICO.  "Collaboration" is not an element of the Article 140 offense; it merely describes the relationship among the constituent parts of the "organization."  Just as an "enterprise" for purposes of § 1962(c) may consist of individuals and entities "associated in fact, although not a legal entity," Fifth Circuit Pattern Jury Instructions, Instruction 2.79, at 388 (2015), an "organization" under Article 140 can include individuals and entities that associate together--"collaborate"--without any formal legal structure.  In the words of the Court of Appeals, the "organization" element of an Article 140 offense requires proof of "a structured organization in which the participants participate in a certain lasting, mutual collaboration."  Ex. B at 979.

"Collaboration" thus does not mean "conspiracy," as the government implies. As discussed above, Dutch law defines "conspiracy" much as United States law does. But it limits conspiracy to certain substantive offenses, and Article 140 is not one of those offenses. Put differently, "collaboration" no more means conspiracy than "associated in fact" does. Both terms describe the relation among the constituent parts of a criminal organization (or "enterprise") that lacks a formal legal structure.

The reference to "filing incorrect corporate income tax returns" is similarly tied to the nature of the "organization." An "organization" under Article 140 "must be for the purpose of committing crimes." Ex. B at 979. The organization alleged in Count 1 had three such purposes: "forgery of documents," "filing incorrect corporate tax returns," and "bribing persons other than civil servants." Ex. B at 884. The fact that one of the three purposes of the criminal organization alleged in Count 1 involved tax returns does not mean that Valentino's conduct--his "participation"--consisted of tax offenses.

The Court of Appeals' opinion makes this point explicit. That court's description of the conduct that made up Valentino's "participation" says nothing about taxes. Ex. B at 884. And, as the Court of Appeals explains, "Participation does not require that the participant him/herself has committed (one of) the crimes intended by the organization, nor that he/she has actually participated in the commission of the crime. *The point is (after all) not involvement in a certain criminal offense, but involvement in the organization.*" Ex. B at 979 (emphasis added). In other words, the conduct at issue in Count 1 is not the filing of false tax returns or either of the other criminal purposes of the organization--it is "involvement in the organization." The United States offense that most clearly proscribes

analogous conduct is 18 U.S.C. § 1962(c), the substantive RICO offense, which punishes participation in the affairs of an enterprise through a pattern of racketeering activity, not the racketeering acts themselves.

To put the point in terms of United States law, consider a substantive RICO offense with predicate acts of mail fraud, securities fraud, and obstruction of justice. No one would think that offense analogous to conspiracy to commit mail fraud. Some of the underlying conduct might overlap, but the two offenses are plainly different; one punishes conducting an enterprise through a pattern of racketeering activity, and the other punishes an agreement to commit one of those acts of racketeering activity. It is the same with Count 1. That count charges participation in a criminal organization, which has as its object the commission of three offenses, one of which is filing incorrect corporate tax returns. Ex. B at 884. Article 140 bears scant resemblance to a conspiracy--an agreement--to commit one of those underlying crimes, but it closely resembles a substantive RICO offense.

Viewing Valentino's allegedly criminal conduct in light of the elements of an Article 140 offense, it is clear that the substantive RICO statute, 18 U.S.C. § 1962(c), is "most closely analogous to" Article 140. *Sainez*, 588 F.3d at 716. The general conspiracy statute, § 371, is not analogous to Article 140, and it is certainly not as "closely analogous" as § 1962(c). It is undisputed that § 1962(c) has a five-year statute of limitations that runs from the defendant's last act. It is likewise undisputed that Valentino's last allegedly criminal act was August 1, 1997, which was more than five years before charges were initiated on November 19, 2002. Count 1 is therefore time-barred under United States law. Extradition on that offense must be denied under Article 6 of the Treaty.

**B.    Count 2.**

**1.    Most Analogous Offense.**

Valentino's conviction on Count 2 involves the filing of five allegedly false corporate tax returns, in violation of Article 68 of the Netherlands State Taxes Act.  Each allegedly false return is charged in a separate paragraph of Count 2, and each paragraph is separated from the others by "and/or."  Ex. B at 861-63.  Each return stands on its own as an offense (indeed, the Dutch courts acquitted Valentino on some of the charged returns, Ex. B  at 911 n.99, 967, 1182).  The text and elements of Article 68 closely parallel the prohibition on filing false tax returns in 26 U.S.C. § 7206(1).  Ex. B at 884-85, 1182; GHX P at 225.  Because Valentino neither signed nor filed the returns in question, the closest analog to Article 68 in this context is 26 U.S.C. § 7206(2), which prohibits willfully "aid[ing]" or "assist[ing] in" the filing of a false tax return.

**2.    The Applicable Statute of Limitations for § 7206(2).**

The statute of limitations for a charge under § 7206(2) is six years under 26 U.S.C. § 6531(3).  *See, e.g., United States v. Hayes*, 322 F.3d 792, 796 (4th Cir. 2003).  The six-year statute of limitations begins to run when the allegedly false return is filed.  *See, e.g., United States v. Habig*, 390 U.S. 222, 223-26 (1968); *United States v. Kelley*, 864 F.2d 569, 574 (7th Cir. 1989).

**3.    Three of the Five Tax Returns on Which Valentino Was Found Guilty in Count 2 Were Outside the Six-Year Statute of Limitations.**

Application of the six-year statute of limitations is straightforward.  For the three returns in Count 2 that were filed September 15, 1995, charges were time-barred after

September 14, 2001, and thus were barred on November 19, 2002 when prosecution was initiated against Valentino.  Charges for the two returns filed August 1, 1997, by contrast, were timely; the statute of limitations did not expire for those returns until July 31, 2003.

### 4.    The Magistrate Judge's Opinion.

The Magistrate Judge rejects the analogy between Article 68 and 26 U.S.C. § 7206 and concludes instead that the most analogous offense is tax evasion under 26 U.S.C. § 7201.  Ex. C at 30-31.  This is error; both the elements of an Article 68 offense and Valentino's alleged conduct with respect to that offense line up almost identically with the elements of an offense under § 7206(2).  *Compare* Ex. B at 884-85, 1182 (outlining elements of Article 68 offense and Valentino's alleged conduct with respect to Count 2) *with* Fifth Circuit Pattern Jury Instructions, Instruction 2.102B, at 494 (2015) (elements of § 7206(2) offense).  Both statutes make it a crime to assist in preparing and filing a tax return that the defendant knows to be false.  By contrast, the elements of tax evasion under § 7201--set out at Fifth Circuit Pattern Instruction 2.101, at 488--match neither the elements of Article 68 nor Valentino's alleged Count 2 conduct.  As between § 7201 and § 7206(2), the latter is clearly most analogous to the Article 68 offense alleged in Count 2.

A key difference between § 7201 and § 7206(2) confirms this point.  Section 7201 requires proof of "a substantial tax deficiency owed by the defendant to the Internal Revenue Service."  Fifth Circuit Pattern Instruction 2.101, at 488.  Section 7206(2), by contrast, does not require proof of a tax deficiency; it only requires proof that the falsehood on the charged return was "material," meaning that it "has a natural tendency to influence, or is capable of influencing, the Internal Revenue Service in investigating or auditing a tax

return or in verifying or monitoring the reporting of income by a taxpayer."  Fifth Circuit

Pattern Instruction 2.102B, at 494-95.

In determining which offense--§ 7201 or § 7206(2)--is most analogous to Article

68, this clear difference between the two statutes provides a useful test.  Does Article 68

require proof of a tax deficiency, like § 7201, or merely that the falsehood on the charged

return be material, like § 7206(2)?  The Amsterdam Court of Appeals answered this

question decisively.  Rejecting a defense argument that the absence of any tax due and

owing required acquittal on Count 2, the Court of Appeals declared that "the result of filing

incorrect returns could have been that too little tax could have been assessed.  *It is not*

*required that too little tax was actually assessed*."  Ex. B at 976 (emphasis added).  As this

passage makes clear, Article 68 does not require proof of a tax deficiency, as § 7201 does.

Instead, like § 7206(2), it requires only that "the result of the incorrect declaration could

be that too little tax could be levied"--in other words (in the language of Fifth Circuit

Pattern Instruction 2.102B), that the falsehood was "material," defined as "capable of

influencing" the taxing authority's determination of the tax due.[7]

For these reasons, § 7206(2) is the most analogous United States offense to Article

68.  A six-year statute of limitations therefore applies, 26 U.S.C. § 6531(3), and under

---

[7] The Magistrate Judge asserts that Valentino "misconstrues the opinion by the Court of Appeals of Amsterdam" on this point.  Ex. C at 32.  We respectfully disagree.  The Court of Appeals declared that under Article 68 (just as with § 7206) "[i]t is not required that too little tax was actually assessed"; instead, the prosecution need only show that "the result of filing incorrect returns *could have been* that too little tax could have been assessed.  Ex. B at 976 (emphasis added).  The absence of any deficiency requirement in Article 68 clearly distinguishes that statute from the United States offense of tax evasion, which has as an element a tax deficiency.

*Habig* and *Kelley* the limitations period begins to run when the return is filed.  The three September 1995 returns are time-barred and therefore not extraditable under Article 6 of the Treaty.

> ### C.   The Appropriate Relief.

Under Article 6 of the Treaty, extradition "shall not be granted" on Count 1 and on three of the five tax returns charged in Count 2.  The Court of Appeals did not specify a particular sentence on each count or on each return at issue in Count 2; it simply pronounced an overall sentence of 34 months on Counts 1 and 2 combined.  Ex. B at 1188. Because the majority of the charges on which the 34-month sentence rests are time-barred, including the most serious charge (Count 1), the Court should hold that Valentino cannot be extradited to serve that sentence.  Subject to the arguments in the following sections, the Netherlands is free to resentence Valentino solely on the two returns filed August 1, 1997, and to resubmit its extradition request for service of that (presumably far shorter) sentence.

The Magistrate Judge concludes that certification is proper even if three of the five returns are outside the statute of limitations and thus non-extraditable under Article 6.  Ex. C at 34.  The Magistrate Judge reaches this conclusion by noting that if Valentino were being sentenced in the United States for filing the two false returns within the statute of limitations, the three time-barred returns would be considered "relevant conduct" under the Sentencing Guidelines.  Ex. C at 34.  But Valentino was not sentenced under United States law; he was sentenced under Dutch law, and nothing in the record suggests that a Dutch

court resentencing Valentino for the two 1997 returns would include the three time-barred returns in the sentencing determination.[8]

The Magistrate Judge also suggests that the "rule of non-inquiry counsels against criticizing charging practices in the Netherlands." Ex. C at 34. But viewing Count 2 as charging five separate tax returns (as it plainly does, in light of the separate paragraphs connected by "and/or") does not imply any "criticism" whatsoever. The rule of non-inquiry has no significance in this context.

\* \* \* \*

For the foregoing reasons, the Court should consider granting extradition only if the Amsterdam Court of Appeals pronounces sentence on the timely portions of Count 2 and the Netherlands then resubmits the extradition request.

## II.     THE UNJUSTIFIED AND INEXCUSABLE DELAY IN FILING THE EXTRADITION COMPLAINT VIOLATES VALENTINO'S RIGHT TO DUE PROCESS AND THUS EXTRADITION MUST BE DENIED UNDER ARTICLE 6 OF THE TREATY.

Article 6 bars extradition for a second reason: the extraordinary and inexcusable delay between the trial court's in absentia verdict on February 24, 2004 and the filing of the extradition complaint in this Court on February 2, 2018 violated Valentino's Fifth Amendment right to due process. In light of this constitutional violation, "enforcement of the penalty for the offense[s] for which extradition has been sought has become barred by lapse of time according to the law of the Requested State."

---

[8] Of course, resentencing is even more clearly required if, as Valentino contends, extradition is barred on Count 1, as well as on the three 1995 returns charged in Count 2.

A.      The Due Process Limits on Delayed Enforcement.

In *Betterman v. Montana*, 136 S. Ct. 1609 (2016), the Supreme Court held that the Sixth Amendment speedy trial guarantee does not apply once trial is over.  The Court declared, however, that in the postverdict setting "due process serves as a backstop against exorbitant delay."  *Id*. at 1607.  That "backstop" protects against "exorbitant" delays in sentencing a defendant, and it likewise protects against exorbitant delays in executing a sentence once imposed.  *See, e.g., Shields v. Beto*, 370 F.2d 1003, 1004 (5th Cir. 1967) (due process violation to delay execution of sentence 28 years); *Piper v. Estelle*, 485 F.2d 245, 246 (5th Cir. 1973) (per curiam) (for due process violation to occur under *Shields*, government action in delaying execution of sentence must be "so affirmatively wrong or its inaction so grossly negligent that it would be unequivocally inconsistent with fundamental principles of liberty and justice to require a legal sentence to be served in the aftermath of such action or inaction").  The due process principles that the Fifth Circuit recognized in *Shields* and *Piper* apply as well in the extradition context.  *See In re Extradition of Harrison*, 2004 U.S. Dist. LEXIS 9183 (S.D.N.Y. May 19, 2004) (applying *Shields*/*Piper* due process standard to delay by Belgium in seeking extradition; no due process violation where delay was four years, the government of Belgium was not grossly negligent, and the defendant suffered no prejudice).

The delay here between the judgment on which the Netherlands seeks to imprison Valentino and the filing of the extradition complaint is certainly "exorbitant."  As described above, the Netherlands authorities issued a summons to Valentino dated November 19, 2002.  The trial concluded February 24, 2004, and Valentino noticed his appeal on March

3, 2004.  Ex. B at 1187.  It took another three and a half years, until July 13, 2007, for the Court of Appeals to enter its judgment and impose the 34-month sentence that the Netherlands now seeks to execute.  The Court of Appeals concedes that this lengthy appeal process exceeded "the reasonable time referred to in Article 6(1) ECHR," albeit only "slightly."  Ex. B at 1187.

By that point, more than four and a half years had passed from the initiation of the (mostly time-barred) charges until the entry of the judgment on which extradition would eventually be sought.  But it would be another ten and a half years before an extradition complaint was actually filed.

First it took the Netherlands Supreme Court almost two years, until July 7, 2009, to determine that Valentino's appeal was inadmissible and enter judgment against him.  This delay is hard to understand; Valentino's counsel neither entered an appearance nor filed a brief in the Supreme Court, so the matter could have been decided in a matter of months. The record contains no explanation for this delay.[9]

On October 12, 2009, three months after the long-delayed Netherlands Supreme Court decision, Valentino was placed on the Netherlands' "national list of wanted persons" because--according to the Netherlands--"his temporary or permanent residence was

---

[9] From inquiry by Valentino's Dutch counsel of the Supreme Court clerk, it appears that the Court of Appeals transferred the file to the Supreme Court on September 29, 2007.  On November 19, 2007, the Supreme Court issued a briefing notice giving Valentino 60 days to file his brief.  He did not file a brief by the deadline.  By the end of January 2008, therefore, it was evident that Valentino would not pursue his Supreme Court appeal.  But it took that court another full year (until February 3, 2009) to declare the appeal "inadmissible" and several more months (until July 9, 2009) to enter judgment against him.

unknown." GHX B at 62. This is nonsense. Valentino's home address was listed in the Court of Appeals' decision. Ex. B at 858. He resided openly in Texas and could easily have been found with even the slightest effort.

In November 2009, the FAST team requested Valentino's file from the Procurator General's office at the Court of Appeals. GHX B at 63. It took nine more months, until August 2010, for FAST to receive the file. GHX B at 63. The record contains no explanation for this delay.

More than two years passed without (as far as the record reveals) any effort by the Netherlands to extradite Valentino. The record contains no explanation for this delay. On November 8, 2012, the Netherlands claims to have prepared a request for Valentino's provisional arrest in preparation for extradition, which the Dutch Ministry of Foreign Affairs allegedly transmitted to the embassy in Washington, D.C. four months later, on March 19, 2013. Inexplicably (at least on this record), the request was never received at the embassy. GHX B at 30, 63.

More months passed. Sometime around August 27, 2013, the Netherlands transmitted another request for provisional arrest and extradition. GHX B at 50, 58, 63.

Another year and a half passed without any apparent effort by either government to advance Valentino's extradition. The record contains no explanation for this delay. On May 7, 2015, the United States sent the Netherlands a diplomatic note identifying various deficiencies in the 2013 extradition package. GHX T at 2. The Netherlands provided some supplemental information on June 9, 2015 (GHX T at 2) and in December 2015 (GHX R-

2, GHX D at 2).   On July 6, 2016, the Netherlands resubmitted the entire extradition package.   GHX T at 2; GHX R-4; GHX R-7.

The July 6 extradition request apparently failed adequately to identify Valentino.   It is extraordinary--to put it mildly--that this should be a problem.   Valentino lived openly in Texas.   His photograph and biography had appeared on the Chamberlain, Hrdlicka website until he left the firm in 2004.   A few minutes on the internet would have provided any information the Netherlands officials lacked.   But it took almost a year--until June 27, 2017--for the United States government to convey its concerns about the adequacy of the identifying information and for the Netherlands to respond.   And even then the Netherlands apparently did no more than re-send information it had already provided to the DOJ.   GHX R at 1.   The record contains no plausible explanation for this delay.[10]

One might think that, with the June 27, 2017 communication, the extradition package would be complete and the extradition complaint could be filed.   But it took seven more (unexplained) months, until February 2, 2018, for the filing to occur.   By then more than twenty years had passed since the last unlawful act Valentino is alleged to have committed (August 1, 1997).   Almost fourteen years had passed since the trial court verdict

---

[10] The government asserted before the Magistrate Judge that "[e]stablishing identity was particularly challenging for Dutch authorities in this case, where they did not have a photograph of Valentino and he had not appeared in Dutch criminal proceedings."   Mag. Doc. 18 at 20 n.15.   But it could not have been all that "challenging" to ensure that the Joseph Valentino the Netherlands sought to extradite was the same Joseph Valentino who had advised Oxbridge, when the Netherlands authorities had his home and office addresses, his law firm affiliation, his date of birth, and other identifying information, and he lived openly in Texas.   There might be difficult aspects of this case, but establishing Valentino's identity is not one of them.

(February 24, 2004).  More than ten and a half years had passed since the Court of Appeals pronounced Valentino's sentence (July 13, 2007).  More than eight and a half years had passed since the Supreme Court had ruled Valentino's appeal inadmissible and the judgment had become final (July 7, 2009).  During that span of time, Valentino had aged from 51 in August 1997 to 71 in February 2018.

The length of this delay is extraordinary.  Many of the periods of delay are unexplained on this record.  It is fair to infer that those unexplained delays result from negligence on the part of the Netherlands or the United States or both.  Where explanations have been offered, they are absurd.  A 2013 extradition request transmitted by the Ministry of Foreign Affairs to the embassy in Washington, D.C. got lost in transmission--and apparently no one at the MFA bothered to check with the embassy to confirm receipt. Years passed in a ridiculous back-and-forth between the Netherlands and the DOJ over Valentino's identity, which was not and could not have been in dispute.  The inference is manifest on this record that the two governments have been grossly negligent in pursuing Valentino's extradition.  An evidentiary hearing will make that conclusion inescapable.

The extraordinary and inexcusable delay in pursuing extradition has been profoundly damaging to Valentino.  He had to live every day between July 13, 2007 and February 2, 2018 with the knowledge that he could be arrested at any minute without warning and dragged off to the Netherlands to be imprisoned for years.  His career as an attorney suffered during his most productive years.  His mental and physical health suffered.  His personal life suffered.  These harms weigh heavily in the due process balance. *See, e.g., Barker v. Wingo*, 407 U.S. 514, 532 (1972) (in Sixth Amendment speedy trial

context, bar on unreasonable delay serves, among other interests, to "minimize anxiety and concern of the accused"); *Moore v. Arizona*, 414 U.S. 25, 27-28 (1973) (per curiam) (same); *United States v. Marion*, 404 U.S. 307, 320 (1971) (same); *see also Betterman*, 136 S. Ct. at 1619 (Sotomayor, J., concurring) (noting that *Barker* factors may guide a post-verdict due process inquiry).  Just as "a prolonged delay [in starting trial] may subject the accused to an emotional stress that can be presumed to result in the ordinary person from uncertainties in the prospect of facing public trial or of receiving a sentence longer than, or consecutive to, the one he is presently serving," *Strunk v. United States*, 412 U.S. 434, 438 (1973), a prolonged delay in executing punishment (including through extradition) can have those same detrimental effects.

Because the delay in filing the extradition complaint was extraordinarily long, resulted from gross negligence by the two governments involved, and caused Valentino significant prejudice, the Court should find that his right to due process has been violated and deny extradition under Article 6 of the Treaty.

**B.     The Magistrate Judge's Opinion.**

The Magistrate Judge does not address the merits of Valentino's due process claim. Instead, invoking the "rule of non-inquiry," the Magistrate Judge concludes that due process affords no protection against delays in the extradition process.  Ex. C at 23-24. Under this approach, a foreign nation and the United States could wait twenty years, or thirty, to enforce a foreign sentence; they could do so for any reason or no reason or even for a malicious reason; and a federal court would have no choice but to dutifully sign the order certifying extradition.

Some courts undoubtedly view the law as the Magistrate Judge does.  Ex. C at 23 (citing cases).  But there is another, conflicting line of cases the Magistrate Judge does not address.  Those cases hold that the Constitution trumps any contrary treaty provision.  *See, e.g., Boos v. Berry*, 485 U.S. 312, 324 (1988) ("[I]t is well-established that 'no agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution.'") (quoting *Reid v. Covert*, 354 U.S. 1, 16 (1957)).

A court should, of course, try to harmonize any apparent conflicts between the Constitution and a treaty.  Here, the most natural way to reconcile the two is to read the phrase "barred by the lapse of time according to the laws of the Requested State" in Article 6 to include not only the statute of limitations, but also due process principles that forbid undue delay in the execution of judgments.  *See, e.g., Piper v. Estelle*, 485 F.2d 245, 246 (5th Cir. 1973) (per curiam); *Shields v. Beto*, 370 F.2d 1003, 1004 (5th Cir. 1967).  This interpretation of Article 6--adopted in *In re Extradition of Harrison*, 2004 U.S. Dist. LEXIS 9183, at *14 (S.D.N.Y. May 19, 2004)--avoids the significant constitutional questions that would arise if that provision were read (as the Magistrate Judge concludes) to impose no limits on delay between final judgment and an extradition request.  *See Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) ("It is a cardinal principle of statutory interpretation . . . that when an Act of Congress raises a serious doubt as to its constitutionality, this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.") (quotations omitted).  As *Boos* makes clear, however, if the Court concludes that the Treaty cannot be interpreted in harmony with the Constitution, the Constitution

must prevail.  Under the Constitution, the years of inexcusable delay between judgment and the filing of the extradition complaint violate Valentino's right to due process and thus preclude extradition.

## III.    THE INFORMATION PROVIDED BY THE NETHERLANDS FAILS TO ESTABLISH PROBABLE CAUSE TO BELIEVE THAT VALENTINO HAD THE REQUISITE MENS REA AND THUS EXTRADITION MUST BE DENIED.

Extradition must be denied for an a third reason: the Netherlands has failed to establish probable cause to believe that Valentino committed either of the charged offenses.

### A.    The Absence of Probable Cause.

Probable cause in the extradition setting requires evidence that will "support a reasonable belief that [the person requested] was guilty of the crimes charged." *Austin v. Healey*, 5 F.3d 598, 605 (2d Cir. 1993) (quotation omitted); *see, e.g., In re Gonzalez*, 305 F. Supp. 2d 682, 691 (S.D. Tex. 2004).  When a person has been convicted in absentia--as Valentino was--the conviction is treated as a mere charge; the requesting country must present evidence to meet its probable cause burden.  *See, e.g., In re Extradition of Ernst*, 1998 U.S. Dist. LEXIS 10523, at *19-*23 (S.D.N.Y. July 14, 1998) (citing cases); *In re Ribaudo*, 2004 U.S. Dist. LEXIS 1456, at *11-*13 (S.D.N.Y. Jan. 30, 2004); *Germany v. United States*, 2007 U.S. Dist. LEXIS 65676, at *20-*21  (E.D.N.Y. September 5, 2007); *United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1365 (S.D. Fla. 1999).

For two reasons, the Netherlands' submission falls short of establishing probable cause.  First, the Netherlands relies for its "evidence" almost entirely on the opinion of the Court of Appeals.  It has submitted only three pieces of actual evidence: a May 18, 1995,

letter from Valentino to a man named Ross Fuller, GHX N; GHX R-3; a January 16, 1992, letter from Earth Energy Consultant of Lexington, Kentucky, GHX C at 121-26; and a January 6, 1978, letter from Tri State Engineering of Vansant, Virginia, GHX C at 127-29. The 1995 Valentino letter merely outlines a tax structure that is not alleged to be unlawful. The Earth Energy and Tri State letters show vast quantities of coal in certain Kentucky coal fields. Although neither letter is addressed to Valentino and there is no record evidence he ever saw them, they appear to support the value of some of the intangible rights at issue and thus are, if anything, exculpatory.

The Court of Appeals' opinion itself refers to and quotes selectively from a number of additional documents and witness interviews. But the opinion does not attach those materials, and the extradition package does not otherwise include them (except for the three innocuous letters described above). Because "the underlying evidence has not been made available [to Valentino or to the Court], the Court cannot make an independent determination concerning whether there is probable cause to believe that [Valentino] committed the crimes charged." *Ribaudo*, 2004 U.S. Dist. LEXIS 1456, at *16-*17; *see, e.g., Ernst*, 1998 U.S. Dist. LEXIS 10523 at *29-*30 (probable cause not established where the only evidence of criminality "is the decision rendered by the Zurich Supreme Court"; absent the underlying evidentiary materials cited in the opinion, the court cannot make an independent probable cause determination). Absent *evidence* establishing probable cause, the Netherlands' request for extradition should be denied and its complaint dismissed. *See Ribaudo*, 2004 U.S. Dist. LEXIS 1456, at *31.

Second, even if the Court of Appeals' opinion is treated as evidence, it does not establish probable cause to believe that Valentino is guilty of the charged crimes. The Court of Appeals concedes that Oxbridge's purchase of for-profit companies from ABN/AMRO Bank and the tax structure that Valentino and Van Dieren (the Dutch tax counsel who worked for Arthur Andersen) developed were both lawful. Ex. B at 898, 970, 980, 1021, 1030, 1138-39. According to the Court of Appeals, the alleged illegality arose from overvaluing assets that Oxbridge sold to the for-profit companies and then overstating the depreciation of those assets on the corporate tax returns of those companies.

The critical question, therefore, is whether Valentino knew that the assets were overvalued. Although the Court of Appeals' opinion purports to address this question, Ex. B at 1021-31, it cites no actual evidence establishing that Valentino had such knowledge. The opinion does not quote from the statement of any witness who claimed that Valentino knew the assets were overvalued. The opinion quotes no letter from or to Valentino that reflects knowledge on his part that the assets were overvalued. The opinion simply asserts that Valentino "had to have known" the inculpatory facts about the assets. Ex. B at 1031. But the Court of Appeals' supposition about what Valentino "had to have known" is not evidence, and it certainly does not establish probable cause to believe that he committed a crime. Absent a showing of probable cause, extradition must be denied. *See, e.g., In re Ferriolo*, 126 F. Supp. 3d 1297, 1302-04 (M.D. Fla. 2015) (finding lack of probable cause to extradite); *In re Extradition of Lehming*, 951 F. Supp. 505, 517-18 (D. Del. 1996) (denying extradition where requesting country's submission did not establish probable cause to believe, among other things, that defendant acted with requisite mens rea).

### B.     The Magistrate Judge's Opinion.

The Magistrate Judge concludes that the Court of Appeals' opinion constitutes competent evidence, even in the absence of the underlying documents and interviews, and that the opinion establishes probable cause.  Ex. C at 6-21.  We respectfully disagree.

Some federal courts--like the Magistrate Judge here--have accepted foreign judicial opinions as competent and sufficient evidence of probable cause for extradition.  But other courts have insisted on reviewing the evidence themselves, rather than accepting the findings of a foreign court (especially one that tried the defendant in absentia).  For example, Magistrate Judge Pitman of the Southern District of New York refused to accept a Swiss judicial opinion in lieu of underlying evidence.  Judge Pitman declared:

> Although the opinion contains a multitude of cites to documentary exhibits, the exhibits themselves are not described, and the statements of "fact" in the opinion are actually the conclusions that the Zurich Supreme Court has drawn from the exhibits.  Since the underlying evidence has not been made available, there is no basis on which the Court can make the required independent determination as to whether probable cause exists.

*Ernst*, 1998 U.S. Dist. LEXIS 10523, at *30 (footnote omitted).  This Court should adopt the same approach; it too should make an "independent determination" whether probable cause exists.  Because the Netherlands has not seen fit to provide the evidence on which the Amsterdam Court of Appeals relied, despite ample opportunity to do so, the Court should find that it has not satisfied the probable cause standard.

The Magistrate Judge further errs in concluding that the Netherlands has established probable cause to believe that Valentino knew the assets Oxbridge sold to the for-profit companies were overvalued.  Ex. C at 20-21.  The Magistrate Judge, like the government

in its briefs, notes the length and complexity of the Court of Appeals opinion.  Ex. C at 9-11.  What the Magistrate Judge does not do, however, is cite a single piece of evidence (other than the Court of Appeals' ipse dixit) establishing that Valentino knew the assets were overvalued.  The Court of Appeals asserts that Valentino "had to have known," Ex. P at 1031, but what documents or testimony support that conclusion?  What circumstantial evidence supports a finding of knowledge or intent?  What chain of inferences from established facts permits the Magistrate Judge to find probable cause that Valentino knew the assets were overvalued?  The opinion does not say.

The Court should require production of the evidence underlying the Court of Appeals' opinion; it should review that evidence; and then it should find that the Netherlands has not established probable cause that Valentino is guilty on either count.

## CONCLUSION

For the foregoing reasons, the Court should grant the writ of habeas corpus and deny the Netherlands' request to extradite Valentino.

Respectfully Submitted,


*/s/ Chris Flood*                                   
Chris Flood
Email: chris@floodandflood.com
FLOOD & FLOOD
914 Preston at Main, Suite 800
Houston, TX 77002
713-223-8877
713-223-8879 fax


*/s/ John D. Cline*                                
John D. Cline
Email: cline@johndclinelaw.com
California Bar No. 237759
50 California St., Suite 1500
San Francisco, CA 94111
(415) 662-2260
(415) 662-2263 (Fax)

**ATTORNEYS FOR JOSEPH VALENTINO**




**CERTIFICATE OF SERVICE**

I hereby certify that on January 24, 2020, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Chris Flood*                                 
Chris Flood